## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD HARRIS,** | **:** | |
| | **:** | |
| **Plaintiff,** | **:** | |
| | **:** | |
| **v.** | **:** | **CIV. NO. 2:21-cv-03006** |
| | **:** | |
| **T-MOBILE USA, INC.; DOES 1** | **:** | |
| **through 10, inclusive** | **:** | |
| | **:** | |
| **Defendant(s).** | **:** | |

## DEFENDANT T-MOBILE'S REPLY MEMORANDUM IN SUPPORT OF AMENDED MOTION TO COMPEL ARBITRATION AND STAY CASE

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION ........................................................................................ 1

II.  ARGUMENT .............................................................................................. 2

    A.   Mr. Harris Should Be Compelled to Arbitrate His Claims. ................... 2

        1.   Mr. Harris Agreed to Be Bound by the Metro Arbitration Agreement. ..... 2

        2.   Mr. Harris's Claims Fall within the Broad Scope of the Agreement.......... 6

    B.   Mr. Harris's Objections to Arbitration Were Delegated to the Arbitrator.............. 8

    C.   Mr. Harris's Arguments in Opposition Each Fail for Other Reasons.................. 11

        1.   Mr. Harris's Enforceability Challenges Are Severable. .......................... 11

        2.   Mr. Harris's Arbitrability Challenges Fail in Any Event. ....................... 12

III. CONCLUSION.......................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AT&T Techs, Inc. v. Comm'ns Workers*,
  475 U.S. 643 (1986)...................................................................................................8

*Bracy v. Macy's Retail Holdings, Inc.*,
  2020 U.S. Dist. LEXIS 71550 (E.D. Pa. Apr. 23, 2020) .........................................3

*Brandywine Prof. Servs., LLC v. Quiqley*,
  2015 WL 6598537 (E.D. Pa. Oct. 30, 2015)............................................................4

*Buckeye Check Cashing, Inc. v. Cardegna*,
  546 U.S. 440 (2006).............................................................................................11, 12

*Century Indem. Co. v. Certain Underwriters at Lloyd's London*,
  584 F.3d 513 (3d Cir. 2009)..........................................................................2, 8, 10

*Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*,
  809 F.3d 746 (3d Cir. 2015)......................................................................................9

*Choe v. T Mobile USA, Inc.*,
  2018 WL 6131574 (C.D. Cal. Aug. 1, 2018)...........................................................7

*Clerk v. ACE Cash Exp., Inc.*,
  2010 WL 364450 (E.D. Pa. Jan. 29, 2010) ............................................................15

*Clerk v. First Bank of Del.*,
  735 F. Supp. 2d 170 (E.D. Pa. 2010) ..................................................................9, 14

*Dean Witter Reynolds, Inc. v. Byrd*,
  470 U.S. 213 (1985)...................................................................................................2

*Fluke v. Cashcall, Inc.*,
  2009 WL 1437593 (E.D. Pa. May 21, 2009) .........................................................15

*Gilmer v. Interstate/Johnson Lane Corp.*,
  500 U.S. 20 (1991)...................................................................................................14

*Golden Gate Nat'l Senior Care, LLC v. Beavens*,
  123 F. Supp. 3d 619 (E.D. Pa. 2015) .....................................................................15

*Green Tree Fin. Corp. v. Randolph*,
  531 U.S. 79 (2000).....................................................................................................6

*Harris v. Green Tree Fin. Corp.*,
  183 F.3d 173 (3d Cir. 1999) ............................................................................13

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019) ......................................................................................8

*Hopkins v. New Day Fin.*,
  643 F. Supp. 2d 704 (E.D. Pa. 2009) ............................................................13

*Juric v. Dick's Sporting Goods, Inc.*,
  2020 WL 4450328 (W.D. Pa. Aug. 3, 2020) ...............................................3, 4

*Keller v. Pfizer, Inc.*,
  2018 WL 5841865 (M.D. Pa. Nov. 8, 2018) ...............................................3, 4

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
  560 F.3d 156 (3d Cir. 2009) ............................................................................10

*MacDonald v. Unisys Corp.*,
  951 F. Supp. 2d 729 (E.D. Pa. 2013) ............................................................11

*Mendez v. T-Mobile USA, Inc.*,
  2022 U.S. Dist. LEXIS 8103 (S.D. Fla. Jan. 10, 2022) .................................11

*Mitas Endustri Sanayi Ticaret A.S. v. Valmont Indus.*,
  2021 WL 3169301 (D. Del. July 27, 2021) ....................................................9

*Neff v. Portfolio Recovery Assocs., LLC*,
  2021 WL 4958690 (W.D. Pa. Oct. 26, 2021) .................................................8

*Puleo v. Chase Bank USA, N.A.*,
  605 F.3d 172 (3d Cir. 2010) ............................................................................10

*Quilloin v. Tenet HealthSystem Philadelphia, Inc.*,
  673 F.3d 221 (3d Cir. 2012) ...........................................................10, 12, 13, 15

*Quilloin v. Tenet HealthSystem Philadelphia, Inc.*,
  763 F. Supp. 2d 707 (E.D. Pa. 2011) ............................................................10

*Rent-A-Center, W., Inc. v. Jackson*,
  561 U.S. 63 (2010) .................................................................................8, 10, 11

*Richardson v. Coverall N. Am., Inc.*,
  811 F. App'x 100 (3d Cir. 2020) .....................................................................9

*Saadeh v. T-Mobile, USA, Inc.*,
  No. 2:21-cv-12871 (D.N.J.), ECF No. 11 ......................................................7

*Schwartz v. Comcast Corp.*,
   256 F. App'x 515 (3d Cir. 2007) ..................................................................................4, 5, 6

*Seme v. Gibbons, P.C.*,
   2019 WL 2615751 (E.D. Pa. June 26, 2019) .........................................................................14

*Shelton v. Comcast Corp.*,
   2021 WL 214303 (E.D. Pa. Jan. 21, 2021) ............................................................................4

*Stephenson v. AT&T Servs.*,
   2021 WL 3603322 (E.D. Pa. Aug. 13, 2021) ...................................................................3, 15

**State Cases**

*Hutt v. Xpressbet, LLC*,
   2020 WL 2793920 (E.D. Penn. May 29, 2020) .....................................................................5

*Salley v. Option One Mortg. Corp.*,
   592 Pa. 323, 925 A.2d 115 (2007) ...............................................................................12, 15

*Simeone v. Simeone*,
   525 Pa. 392, 581 A.2d 162 (1990) .........................................................................................5

**State Statutes**

73 P.S. § 2207 ..........................................................................................................................12

73 P.S. § 2208(c) .....................................................................................................................12

**Rules**

Fed. R. Evid. 406 ......................................................................................................................6

## I.     INTRODUCTION

Mr. Harris does not deny that the agreement governing his relationship with T-Mobile since 2017 contained an arbitration clause, and that his claims arise from alleged third-party interference with his "Metro by T-Mobile" service in 2020.  He now claims that he did not read and was unaware of that arbitration provision, but fails to refute T-Mobile's evidence that he received notice of the arbitration requirement repeatedly over the parties' multiple-year relationship, including through regular text messages referring him to Metro's Terms & Conditions ("T&Cs") and the arbitration provision contained therein.  He also failed to show that his claims based on unauthorized access to his phone line does not fall within the broad scope of the arbitration requirement in the T&Cs.  That should end the inquiry.

Mr. Harris tries to avoid arbitration by pointing the Court to speculative and unfounded claims of fraud, unconscionability, and statutory violations.  But the Court need not decide those arguments.  Instead, the *arbitrator* should decide whether the T&Cs as a whole are enforceable, as specified in that agreement's delegation provision, along with well-established severability rules.  Even if the Court considers them, Mr. Harris's arguments fail on their merits because they lack legal and evidentiary support.  For example, Pennsylvania's Plain Language Consumer Contract Act does not include invalidation of an arbitration clause as an available remedy.  His other arguments, including those of unconscionability, fail as well.

The Court should compel Mr. Harris to resolve his claims against T-Mobile in binding arbitration based on his service agreement and stay this action pending arbitration.[1]

---

[1] The parties previously briefed T-Mobile's original motion to compel arbitration, which was filed on October 28, 2021.  (*See* ECF Nos. 8, 9, 10.)  The original motion was rendered moot by the filing of Mr. Harris's amended complaint.  (*See* ECF Nos. 11, 12, 13.)  T-Mobile filed the present amended motion on the same grounds as before on January 7, 2022.  (ECF No. 14.)  Mr. Harris's opposition papers and declaration are nearly or actually identical to the papers and

## II.     ARGUMENT

### A.      Mr. Harris Should Be Compelled to Arbitrate His Claims.

Mr. Harris does not dispute that the FAA applies to the pending Motion.  (Opp'n 9-10.)

Under the FAA, Mr. Harris is required to arbitrate his claims because (1) "there is a valid

agreement to arbitrate" and (2) "the dispute at issue falls within the scope of that agreement."

*Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 522 (3d Cir.

2009).  Courts are to apply a "presumption of arbitrability" when assessing whether the dispute

falls within the scope of a valid arbitrability agreement.  *Id.* at 524.  When those threshold

elements are satisfied, the FAA "leaves no place for the exercise of discretion by a district court,

but instead mandates that district courts *shall* direct the parties to proceed to arbitration."  *Dean

Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  The Opposition fails to refute

T-Mobile's evidence on this limited inquiry.

### 1.      *Mr. Harris Agreed to Be Bound by the Metro Arbitration Agreement.*

T-Mobile has provided extensive support to establish that Mr. Harris assented to Metro's

T&Cs.  T-Mobile has identified, through a qualified representative, that Mr. Harris received the

Metro Information Sheet that explained the T&Cs and the Arbitration Agreement.  (Norris Decl.

¶¶ 17-19, Ex. E.)  T-Mobile has further shown that at least three devices Mr. Harris received

were sealed with the Metro Box Sticker which references the T&Cs, Arbitration Agreement, and

opt-out information.  (*Id.* ¶¶ 20-21.)  In addition, T-Mobile has shown that Mr. Harris frequently

received text messages that reference the T&Cs including on at least two occasions after he

upgraded his device and each month when he received reminders to pay his bill.  (*Id.* ¶¶ 22-24.)

---

declaration previously submitted in connection with the original motion.  (*Compare* ECF Nos. 9-3, 9-5; *with* ECF Nos. 16-3, 16-5.)

Mr. Harris does not present any evidence to dispute any of this outside of general and insufficient denials.

Mr. Harris states repeatedly that he does "not recall" seeing any agreements, stickers, or text messages.  (Harris Decl. ¶¶ 16-17, 19, 33.)  As this Court and others have repeatedly held, a plaintiff's purported lack of recall is insufficient to avoid arbitration.  *See Stephenson v. AT&T Servs.*, 2021 WL 3603322, at *6 n.8 (E.D. Pa. Aug. 13, 2021) ("Plaintiff's contention that he has 'no recollection' of receiving, opening, or viewing the arbitration emails and was, therefore, not 'aware' of the existence of the Arbitration Agreement is immaterial.") (collecting cases); *Bracy v. Macy's Retail Holdings, Inc.*, 2020 U.S. Dist. LEXIS 71550, at *17 (E.D. Pa. Apr. 23, 2020) ("Plaintiff's contention that she does 'not recall' having received the arbitration agreement does not alter the outcome here.") (collecting sources); *Keller v. Pfizer, Inc.*, 2018 WL 5841865, at *4 (M.D. Pa. Nov. 8, 2018) (accord); *Juric v. Dick's Sporting Goods, Inc.*, 2020 WL 4450328, at *8 (W.D. Pa. Aug. 3, 2020) ("With respect to contractual disputes, federal courts have consistently held that a party's failure to recall a relevant event is insufficient to raise an issue as to the occurrence of that event.").  Indeed, Mr. Harris's purported lack of recall is his primary response to T-Mobile's evidence that he was sent regular text messages to the phone number at issue in this case informing him of the arbitration requirement.  (*See* Harris Decl. ¶¶ 17, 33, 34; Norris Decl. ¶¶ 5-8, 22-24.)[2]  That is insufficient as a matter of law.

_____

[2] The Opposition also refers to scrivener's errors misidentifying Mr. Harris and his phone number from the *prior* motion to compel arbitration submitted on October 28, 2021.  Those errors were previously explained.  (*See* ECF No. 10 at 2 nn.1-2.)  In any event, the errors were corrected in the present motion before the Court and all of T-Mobile's evidence relates to Mr. Harris and his phone number.  (Norris Decl. ¶¶ 5-9.)  In particular, T-Mobile sent Mr. Harris regular text messages informing him of the arbitration requirement directly to his 5600 phone number.  (*Id.* ¶¶ 5-8, 22-24.)

Mr. Harris also states that he was "not provided" a copy of the T&Cs.  (Harris Decl. ¶¶ 5-7, 36.)  There is no such requirement under the law.  *See Juric*, 2020 WL 4450328, at *8 ("Plaintiffs have cited no case law that an arbitration agreement is only valid when the signatory is provided with a copy of the agreement.  Courts instead have held that physical receipt of or a physical signature of an arbitration agreement is unnecessary.").   No such requirement would make sense in these circumstances given that customers are routinely referred to the T&Cs, which may change over time by, e.g., text messages.

Mr. Harris also cannot avoid arbitration because he did not read or sign an arbitration agreement.  (Harris Decl. ¶¶ 8-9, 15-16.)  There is no such requirement under Pennsylvania law to establish a contract.  *See Shelton v. Comcast Corp.*, 2021 WL 214303, at *4, n. 4 (E.D. Pa. Jan. 21, 2021) (court explaining that there is "no real dispute about the existence of the Arbitration Agreement" because plaintiff's "use of [] services binds them…even in the absence of a signed agreement or evidence of the plaintiff's actual receipt of the subscriber agreement."); *Brandywine Prof. Servs., LLC v. Quigley*, 2015 WL 6598537, at *4 (E.D. Pa. Oct. 30, 2015) (under Pennsylvania law assent to a contract does not require "either party to possess, sign, or read the contract at issue"); *Keller*, 2018 WL 5841865, at *4 (rejecting plaintiff's argument that she should not be bound by the arbitration agreement simply because she did not sign a physical paper contract as archaic); *Juric*, 2020 WL 4450328, at *8 ("signatures are not required unless such signing is expressly required by law or by the intent of the parties").  The T&Cs at issue provided for agreement by use of Metro services, which Mr. Harris does not deny.

Consumer arbitration agreements based on this type of notice and conduct are routinely enforced by the Court absent competent evidence refuting the agreement.  *See e.g., Schwartz v. Comcast Corp.*, 256 F. App'x 515, 519 (3d Cir. 2007) (arbitration agreement enforceable despite

plaintiff's argument that he never received or signed the agreement where evidence shows that service was offered through an agreement and plaintiff activated and used the service); *Hutt v. Xpressbet, LLC*, 2020 WL 2793920, at *5 (E.D. Pa. May 29, 2020) (compelling arbitration where plaintiff assented to arbitration agreement by using website and arbitration agreement states that opening account and using website constituted acceptance).

*Schwartz v. Comcast Corp.* is analogous to this case.  In *Schwartz*, the Third Circuit found that a consumer was bound under Pennsylvania law to a subscriber agreement that included an arbitration clause despite never signing the agreement and denying ever receiving or reading the agreement.  Comcast relied on evidence that it had "consistent practice regarding delivery of subscription agreements" and that Schwartz continued to utilize the service.  *Id.* at 516-517, 518.  In response, Schwartz denied ever receiving a copy of the agreement.  *Id.*  Despite Schwartz's denials, the Third Circuit explained that "Comcast offered internet service under the terms of its Subscriber Agreement, and Schwartz accepted the service, so the terms of the contract are provided by the Subscriber Agreement."  *Id.* at 520.  Furthermore, in response to Schwartz's argument that the agreement was too hard to find, the Third Circuit noted that the subscriber agreement was always available online and failure to read the agreement, under Pennsylvania law, "does not excuse a party from being bound by its terms."  *Id.* (citing *Simeone v. Simeone*, 525 Pa. 392, 581 A.2d 162, 165 (1990)).

The same is true here.  T-Mobile provided service to Mr. Harris pursuant to the T&Cs, including its arbitration provision.  Mr. Harris accepted the service by, e.g., using it for years, and therefore is bound by the agreement's terms.  For instance, his mere failure to "recall" the text messages alerting him to the T&Cs and arbitration requirement specifically are legally insufficient.  Indeed, Mr. Harris's operative First Amended Complaint presumes an agreement

between himself and T-Mobile exists.  (*See, e.g.*, First Am. Compl., ECF No. 14, ¶ 62 ("Plaintiff

was a wireless customer of T-Mobile…"); *id.* ¶ 64 (Harris relied upon T-Mobile's "assurances of

and its stated compliance with applicable laws"); *id.* ¶ 131 ("T-Mobile owed a duty of care to its

customers…").)  Mr. Harris's Opposition briefing similarly argues that T-Mobile breached part

of an agreement with Mr. Harris that Mr. Harris is seeking to avoid.  (Opp'n 33.)  Mr. Harris

further acknowledged that he is bound by the Terms & Conditions by attempting to opt out after

filing his lawsuit—well after the opt-out deadline.  (Harris Decl. ¶ 38.)  As Mr. Harris concedes,

arbitration terms are ubiquitous in agreements for low-cost cellular service offered by all of the

major telecommunications companies across the country.  (Opp'n 30, Exs. E-H.)

Mr. Harris identifies no alternative agreement governing his years-long relationship with

T-Mobile other than the T&Cs.  On the other hand, T-Mobile has established that Mr. Harris was

repeatedly made aware of the T&Cs, including when he first initiated service, each time he

upgraded his device, and each time he received a text message notifying him that a payment was

due.[3]  (Norris Decl. ¶¶ 17-24.)

## 2.    *Mr. Harris's Claims Fall within the Broad Scope of the Agreement.*

Mr. Harris's claims against T Mobile's fall within the parties' broad arbitration clause.

(Opp'n 34.)  The party opposing arbitration bears the burden of proving that the claims at issue

are not subject to arbitration.  *See Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91-92

(2000).  Mr. Harris fails to meet that burden.  The Opposition addresses none of the cases

T-Mobile cited in the Motion to establish arbitrability of Mr. Harris's claims.  (*See* Mot. at 12-

13.)  Instead, Mr. Harris cites to a single distinguishable out-of-circuit case involving some

---

[3] Despite the Opposition's unsupported argument to the contrary, T-Mobile may rely on
evidence of its policies to provide the terms and conditions to its 18 million customers.  *See
Schwartz*, 256 F. App'x at 518-519 (citing Fed. R. Evid. 406).

claims found to be outside the scope of the arbitration agreement that, even then, compelled arbitration of the rest.  (Opp'n at 33-34.)

In particular, *Choe v. T Mobile USA, Inc.*, 2018 WL 6131574, at *17-18 (C.D. Cal. Aug. 1, 2018), involved "outrageous" allegations of "criminal hacking" and "larceny" by the plaintiff's girlfriend, acting in concert with a carrier's employee, which the court deemed too remote from the subject of the carrier's service contract containing the arbitration clause.  The court in that case acknowledged that consumers would be bound to arbitrate claims—like those at issue here—"related to [the] business of providing cell phone services."  *Id.* at *5-6 (compelling arbitration of claims related to "unauthorized misuse of customer information" or "breach of [carrier's] safeguards").  Here, T-Mobile's arbitration agreement covers disputes arising from its cellular services, (*see, e.g.*, Norris Decl. ¶ 28), and Mr. Harris's claims arise directly from T-Mobile's alleged failure to prevent unauthorized third parties from accessing and using the very phone line that is the subject of his agreements with T-Mobile.  (First Am. Compl. ¶¶ 102-219.)  Unlike in *Choe*, Mr. Harris does not make any allegations of criminal conduct unrelated to the provision of cellular services.[4]

As explained by the Third Circuit, "[i]n determining whether the particular dispute falls within a valid arbitration agreement's scope, 'there is a presumption of arbitrability [:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted

---

[4] Mr. Harris relies on T-Mobile briefing submitted in a New Jersey case to suggest that T-Mobile made a concession that his factual scenario would be "too remote" for the arbitration requirement to apply.  (Opp'n 1, Ex. C.)  Mr. Harris mischaracterizes the briefing, which responded to the exact same argument being made by Mr. Harris regarding *Choe*.  Tellingly, the New Jersey court granted T-Mobile's motion to compel arbitration over similar objections as those presented by Mr. Harris the same day Mr. Harris filed his opposition brief.  (*See Saadeh v. T-Mobile*, *USA, Inc.*, No. 2:21-cv-12871 (D.N.J.), ECF No. 11.)

dispute.'" *Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 522

(3d Cir. 2009) (quoting *AT&T Techs, Inc. v. Comm'ns Workers*, 475 U.S. 643, 650 (1986)).

Here, Mr. Harris fails to establish such "positive assurance."

      **B.**      **Mr. Harris's Objections to Arbitration Were Delegated to the Arbitrator.**

      As explained in the Motion, the delegation clause requires the arbitrator to decide any

issues relating to gateway issues of arbitrability, including all of Mr. Harris's various objections

to arbitration.  *See Henry Schein, Inc. v. Archer & White Sales, Inc.,* 139 S. Ct. 524, 528 (2019).

      The gateway questions properly delegated to an arbitrator includes "whether the parties

have agreed to arbitrate or whether their agreement covers a particular controversy."  *Rent-A-

Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010).  Under *Rent-A-Center*, if a plaintiff

challenges an arbitration agreement "on grounds that do not specifically challenge the arbitration

provision itself but instead run to the contract as a whole, such as fraud in the inducement or

unconscionability, and the arbitration provision contains a delegation clause, the issue of

enforceability must be committed to the arbitrator in the first instance."  *Neff v. Portfolio

Recovery Assocs., LLC*, 2021 WL 4958690, at *7 (W.D. Pa. Oct. 26, 2021).  "[E]ven when the

grounds for invalidating the delegation provision and the underlying agreement are the same, the

arbitrability challenge must still be directed at the delegation provision specifically to invoke a

court's power to intervene."  *Id.*  "And more specifically, the party seeking a judicial

determination of arbitrability under such circumstances must lodge a challenge to the delegation

clause that is particular and unique to the clause itself."  *Id.* (citing *Rent-A-Center*, 561 U.S. 721).

      As an initial matter, most of Mr. Harris's arguments in his Opposition brief relate to the

entirety of the T&Cs or arbitration agreement rather than the delegation provision specifically.

For instance, he cannot claim that a delegation (as opposed to the arbitration process in general)

is unconscionable.  (Opp'n 24-26.)  He cannot claim that T-Mobile's purported "fraud"

specifically related to the delegation.  (Opp'n 31-33.)  His challenges to a valid contract relate to

the entire arbitration agreement.  (Opp'n 21-23.)  His challenges based on understandability or

legibility relate to the entire T&Cs.  (Opp'n 13-19.)  He does not mention the delegation clause

in those broad swaths of his briefing.  Mr. Harris only makes two arguments against enforcement

of the delegation provision—as opposed to the entire arbitration agreement—on Section III(B)

on pages 19-21 of his Opposition.  Both fail as a matter of law.

   *First*, Mr. Harris objects that the delegation provision in the T&Cs was not a "clear and

unmistakable" delegation based on an incorporation of AAA rules.  (Opp'n 19-20.)  This

argument fails as a matter of settled Third Circuit law.  *See Richardson v. Coverall N. Am., Inc.*,

811 F. App'x 100, 103 (3d Cir. 2020) ("Silva's agreement provides that . . . '[a]rbitration shall be

subject to . . . the then current Rules of the American Arbitration Association for Commercial

Arbitration.'  Clearly and unmistakably then, the AAA Rules govern the arbitration of any

dispute between Silva and Sujol.  And Rule 7(a) of the AAA Rules states that '[t]he arbitrator

shall have the power to rule on his or her own jurisdiction, including any objections with respect

to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim

or counterclaim.' That provision 'is about as "clear and unmistakable" as language can get.'")

(citations omitted); *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763-

64 (3d Cir. 2015) ("[V]irtually every circuit to have considered the issue [of arbitrating

arbitrability] has determined that incorporation of the [AAA] arbitration rules constitutes clear

and unmistakable evidence that the parties agreed to arbitrate arbitrability."); *Mitas Endustri*

*Sanayi Ticaret A.S. v. Valmont Indus.*, 2021 WL 3169301, at *2 n.1 (D. Del. July 27, 2021)

("The Third Circuit has held that the incorporation of the AAA Rules in an arbitration clause

'constitutes clear and unmistakable evidence that the parties agreed to delegate arbitrability.'");

*PPR Research Inc. v. Solvay USA, Inc.*, 2021 WL 2853269, at *3 (E.D. Penn. July 7, 2021)

(accord).  The T&Cs in this case include the same unmistakable delegation provision.  (Brounell

Decl., Ex. A (AAA Consumer Arbitration Rules) R-14; *id.*, Ex. B (AAA Commercial Arbitration

Rules) R-7.)

      *Second*, Mr. Harris argues that the Court instead of the arbitrator must decide his

arbitrability challenges despite the delegation clause.  (Opp'n 20-21.)  Mr. Harris repeatedly

relies upon outdated *non-delegation* cases like *Puleo v. Chase Bank USA, N.A.* and *Quilloin v.

Tenet HealthSystems Philadelphia, Inc.*, to argue that the Court should disregard the controlling

law set forth in *Rent-A-Center* and its progeny.  (Opp'n 20.)  Nothing in those cases supports his

ambitious claim.  Indeed, in *Puleo*, the Third Circuit recognized that "parties can contract

around" the "the general rule that questions of arbitrability are for the court to resolve" by

delegating that authority to the arbitrator in writing.  *Puleo v. Chase Bank USA, N.A.*, 605 F.3d

172, 187 (3d Cir. 2010).  And in *Quilloin*, which cited to *Puleo*, judicial determination of

arbitrability was appropriate because the arbitration agreement did *not* delegate questions of

arbitrability to the arbitrator, unlike the arbitration provisions in *Rent-A-Center* and this case.

*Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221, 229 (3d Cir. 2012) ("it is

important to note that unlike the agreement in *Rent-A-Center*, the [contracts] constitute an

agreement to arbitrate employment issues generally; they do not purport to contain an agreement

to arbitrate arbitrability"); *Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 763 F. Supp. 2d

707, 722-723 (E.D. Pa. 2011).

      The remaining cases cited by Mr. Harris are no different as they did not relate to

delegation at all.  *See Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir.

2009) (not related to delegation provisions in any respect); *Century Indem. Co. v. Certain*

*Underwriters at Lloyd's*, 584 F.3d 513, 552 (3d Cir. 2009) (same); *MacDonald v. Unisys Corp.*, 951 F. Supp. 2d 729, 733 (E.D. Pa. 2013) (same).  Those cases set forth the unremarkable proposition that the Court decides gateway issues when there is no delegation clause; they say nothing about the present circumstances.

Here, like in *Rent-A-Center*, the arbitration agreement includes a provision that the Third Circuit has held constitutes a "clear and unmistakable" delegation.  The Court should enforce it as written as other courts have in indistinguishable circumstances.  *See Mendez v. T-Mobile USA, Inc.*, 2022 U.S. Dist. LEXIS 8103, at *8 (S.D. Fla. Jan. 10, 2022) (enforcing Metro T&C's delegation clause:  "Without a challenge to the Terms and Conditions' severable delegation provision, there is nothing left for the Court to do — other than compel arbitration . . . .").

### C.      Mr. Harris's Arguments in Opposition Each Fail for Other Reasons.

Mr. Harris devotes most of his Opposition to ancillary arguments about the purported unenforceability or unconscionability of the Metro T&Cs.  Given if the Court considers these issues (it should not), none provides a basis for avoiding arbitration.

#### 1.      *Mr. Harris's Enforceability Challenges Are Severable.*

Even without a valid delegation provision like that included in the T&Cs, any claim of unenforceability must be directed specifically at the arbitration clause as opposed to other unrelated portions of the arbitration contract.  The majority of the Opposition, however, challenges the T&Cs as a whole, including the ancillary agreement incorporated therein, rather than focusing on the arbitration agreement itself.

"Challenges to the validity of arbitration agreements 'upon such grounds as exist at law or in equity for the revocation of any contract' can be divided into two types." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006).  "One type challenges specifically the validity of the agreement to arbitrate." *Id.*  "The other challenges the contract as a whole, either

-11-

on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Id.* "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance" because "an arbitration provision is severable from the remainder of the contract." *Id.* at 445.

As a result, Mr. Harris's arguments related to the contract as a whole—such as his arguments under the PLCCA (Opp'n at 12-18) or his unconscionability arguments (Opp'n at 22-29)—are severable.

### 2. *Mr. Harris's Arbitrability Challenges Fail in Any Event.*

### a. The PLCCA Is Irrelevant to Contract Enforceability.

The T&Cs do not violate Pennsylvania's Plain Language Consumer Contract Act (the PLCCA) because they include an easily understandable arbitration agreement. However, it is unnecessary for this Court to make any such assessment as, regardless of compliance with the PLCCA, the arbitration agreement is enforceable. The PLCCA specifically provides that "[a] violation of this act **will not void a contract or otherwise affect is validity.**" 73 P.S. § 2208(c) (emphasis added). Furthermore, Mr. Harris cites to no authority for the proposition that an arbitration agreement can be invalidated by the Court if it violates the PLCCA nor is it a remedy available. *See* 73 P.S. § 2207.

### b. The T&Cs Are Not Unconscionable.

Mr. Harris's claims that the T&Cs are procedurally or substantively unconscionable are baseless. "To prove unconscionability under Pennsylvania law, a party must show that the contract was *both* substantively and procedurally unconscionable." *Quilloin*, 673 F.3d at 230 (emphasis added) (citing *Salley v. Option One Mortg. Corp.*, 592 Pa. 323, 925 A.2d 115, 119 (2007)). To establish unconscionability, Mr. Harris needed to demonstrate that he "lacked a

meaningful choice about whether to accept the provision in question and the challenged provision or contract unreasonably favors the other party to the contract." *Hopkins v. New Day Fin.*, 643 F. Supp. 2d 704, 716 (E.D. Pa. 2009) (internal quotation marks omitted). Mr. Harris bears the burden of proof in this regard. *Id.*

Mr. Harris fails to meet his burden because he lacks evidence supporting his assertion that the T&Cs are unconscionable. For example, the Opposition makes factual assertions regarding the conduct of T-Mobile with regards to SIM-swaps and other litigation throughout the country without any citation or support. (Opp'n 31-33.) These arguments should be wholly rejected by the Court as entirely baseless and unsupported. Regardless, however, Mr. Harris has shown neither substantive nor procedural unconscionability.

Substantive unconscionability requires Mr. Harris to establish "contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party did not assent." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999). "An arbitration agreement cannot be construed as substantively unconscionable where it does not alter or limit the rights and remedies available to [a] party in the arbitral forum . . . ." *Quilloin*, 673 F.3d at 230 (internal citations omitted). Here, Mr. Harris's rights and remedies are not altered in the arbitral forum. Mr. Harris argues that his ability to recover attorneys' fees would be inhibited (Opp'n 24); however, he ignores that the T&Cs specifically provide that Mr. Harris can recover in arbitration the exact same relief as in Court. (*See, e.g.*, Norris Decl. Ex. C at p. 5 ("[Claimant] may recover [his] reasonable attorneys' fees and costs in arbitration *to the same extent as [he] could in court*.") (emphasis added); *id.*, Ex. D at 4 ("THE ARBITRATOR . . . CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT (INCLUDING ATTORNEYS' FEES).)

Mr. Harris's arguments regarding limitations on discovery are similarly unavailing as he makes no showing that the limitations on discovery will "prove insufficient to allow [him] a fair opportunity to present [his claim]." *Gilmer v. Interstate/Johnson Lane Corp*., 500 U.S. 20, 31 (1991).  Rather than explain how any particular limitation will inhibit his opportunity to present his claim, the Opposition makes wholly unsupported suppositions based on "information and belief"—without *any* citation or evidentiary support whatsoever—that T-Mobile refuses to participate meaningfully in discovery.  T-Mobile disputes that allegation.  Yet Mr. Harris misses the points as he fails to explain how the AAA Rules inhibit his opportunity to present his claim.

"The United States Supreme Court has made clear that arbitration discovery procedures are not inadequate merely because 'they might not be as extensive as in the federal courts.'" *Seme v. Gibbons, P.C.*, 2019 WL 2615751, at *6 (E.D. Pa. June 26, 2019) (quoting *Gilmer*, 500 U.S. at 30-31).  The AAA Rules provide the Arbitrator the authority to require the exchange of information not only to promote efficiency but also to promote "equality of treatment and safeguarding each party's opportunity to fairly present its claims and defenses."  (Decl. of Geoffrey S. Brounell ("Brounell Decl.") Ex. B (AAA Commercial Arbitration Rules) R-22.) This provision is discretionary and does not mandate any limitation on discovery and, therefore, is not substantively unconscionable.  *See Seme*, 2019 WL 2615751, at *6 ("[B]ecause the AAA rules grant the arbitrator full discretion to order any depositions, interrogatories, and document productions that are 'necessary to a full and fair exploration of the issues'…we conclude that the rules do not 'unreasonably favor[ ]' Defendant, or inappropriately 'alter or limit [Plaintiff's] rights and remedies.'"); *Clerk v. First Bank of Del.*, 735 F. Supp. 2d 170, 185-186 (E.D. Pa. 2010) (discretionary limitations on discovery in arbitration not substantively unconscionable).

"A contract is procedurally unconscionable where 'there was a lack of meaningful choice in the acceptance of the challenged provision[.]'" *Quillion*, 673 F.3d at 235 (citing *Salley*, 925 A.2d at 119). Mr. Harris argues that the T&Cs were procedurally unconscionable because it is a contract of adhesion presented on a take-it-or-leave-it basis. (Opp'n 28-30.) Mr. Harris's argument is factually inaccurate. Here, Mr. Harris had a meaningful choice because he was provided the opportunity to opt-out of the Arbitration Agreement without any repercussions. (Norris Decl. ¶ 31 (providing 30-day period to opt-out of Arbitration Agreement that would "not adversely affect our relationship with or delivery of Service to you").) Proving the point, he did try to opt out but well after the deadline and after this litigation began. Furthermore, Mr. Harris—like any customer—could have chosen to obtain cellular service from any of T-Mobile's competitors, like the options cited in the Opposition. (Opp'n 16.)

As a result, the contract was not one of adhesion and not procedurally unconscionable. *See Stephenson v. AT&T Serv., Inc.*, 2021 WL 3603322, at *7-8 (E.D. Pa. Aug. 13, 2021) ("Several courts have declined to find arbitration agreements procedurally unconscionable where an opt-out provision gave the plaintiff the ability to reject the agreement without repercussion") (collecting cases); *see also Fluke v. Cashcall, Inc.*, 2009 WL 1437593, at *8 (E.D. Pa. May 21, 2009) (plaintiff had "complete control over the terms of the agreement and it cannot be said that the arbitration agreement was presented to him on a take-it-or-leave-it basis" where he was provided an opt-out clause); *Clerk v. ACE Cash Exp., Inc.*, 2010 WL 364450, at *9 (E.D. Pa. Jan. 29, 2010) (same); *Golden Gate Nat'l Senior Care, LLC v. Beavens*, 123 F. Supp. 3d 619, 632 (E.D. Pa. 2015) (same).

III.     **CONCLUSION**

For the reasons stated herein, Mr. Harris contractually agreed to arbitrate his claims rather than to pursue them in court.  Accordingly, T-Mobile respectfully requests that this Court grant its Motion to Compel Arbitration and stay this case pending arbitration.

Dated:  January 31, 2022                    Respectfully submitted,


**DAVIS WRIGHT TREMAINE LLP**
GEOFFREY S. BROUNELL


By: _/s/ Geoffrey S. Brounell_
          Geoffrey S. Brounell

Attorneys for Defendant
T-MOBILE USA, INC.